NO. 07-12-0228-CV
NO. 07-12-0231-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

NOVEMBER 2, 2012

_____

IN THE INTEREST OF K.J. AND T.J., CHILDREN

_____

FROM THE 320TH DISTRICT COURT OF POTTER COUNTY;

NOS. 75,086-D & 79,622-D; HONORABLE DON EMERSON, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**MEMORANDUM OPINION**

This is a consolidated appeal of two separate orders terminating the parental

rights of Appellant, Debbie,[1] to her children, K.J. (Cause Number 75,086-D, Appellate

Cause No. 07-12-0228-CV), and T.J. (Cause Number 79,622-D, Appellate Cause No.

07-12-0331-CV), pursuant to chapter 161 of the Texas Family Code.[2]  By a single issue,

---

[1]To protect the children's privacy, we refer to Appellant simply by her first name and other interested parties by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d) (WEST SUPP. 2012).  *See also* TEX. R. APP. P. 9.8(b).

[2]Although the *Order of Termination* in each case also terminated the parental rights of the respective fathers, they did not appeal.

Debbie asserts the evidence was legally and factually insufficient to terminate her parental rights. We affirm.

## BACKGROUND

The two children the subject of this proceeding are K.J., a male born in April 2007, and T.J., a male born in March 2010. At the time of their removal, Debbie and her children were residing in a dwelling owned by her mother, M.J., who herself owned the house next door, and the children were ages three years, five months and six months, respectively.

### INVESTIGATION/REMOVAL

Prior to June 2010, the Texas Department of Family and Protective Services had investigated Debbie for reports of physical neglect and neglectful supervision; however, none of those investigations resulted in removal of her children. In June 2010, the Department received a new report alleging that Debbie, T.J.'s father, M.P., and Debbie's sixteen year old son, C.J., had all been smoking marijuana and methamphetamine. Although it was not reported that this conduct occurred in the presence of the children, the Department became concerned that K.J. and T.J. were being exposed to the illicit smoke on a regular basis. The report stated that Debbie and M.P. were "high for days at a time" and they would then "sleep for a very long time." It was further reported that during these periods, M.J. would watch the children, but that she was not physically capable of keeping up with them. In fact, during an investigatory visit, one caseworker described M.J. as inadequately supervising K.J., by allowing him to remain outside, without any direct supervision, adult or otherwise. The report also

2

alleged "the children [were] dirty and smell of urine and that the home is in very poor condition, with the roof caving in parts of the home." When questioned by the Department, Debbie denied using any drugs, but she did concede that C.J., who also lived in the home, had used marijuana in the past and might still be doing so.

Due to allegations of drug use, the Department asked Debbie to submit to a drug test. Initially she refused, noting that she would probably test positive for marijuana, but later consented to the test. In August 2010, she did test positive for marijuana. Due to the perceived neglectful supervision of the children and concern about drug use in the home, the children were removed on September 3, 2010. After the boys were removed from the home, Debbie "had a breakdown," overdosed on her medications, and was admitted to the Pavilion, a psychiatric facility, for evaluation.

Upon her release from the Pavilion, the Department set up a *Family Service Plan*, setting forth certain goals for Debbie to achieve and delineating the circumstances under which the children would be returned to her. The plan included random drug testing, participation in and completion of parenting classes, individual counseling and psychological evaluation, drug and alcohol assessment, completion of drug screens as requested, obtaining and maintaining a "legal source of income" sufficient to support herself and her children, maintenance of a stable household free of hazards, providing appropriate "protection, food and shelter for her family," and demonstration of a "willingness and ability to protect [K.J. and T.J.]."

As a part of her counseling, Debbie reported that prior to September 2010, she had actually been using methamphetamine twice a week and smoking marijuana daily,

3

but she denied any use after that date. She admitted that her drug use included the time when she was pregnant with both children. In 2011, she was placed on probation for felony possession of methamphetamine and misdemeanor theft, and in October of 2011, she was in a substance abuse outpatient treatment program. She subsequently graduated from that program.

On October 4, 2011, as a part of the Department's reunification plan on a "monitored return" basis, T.J. was returned to Debbie. K.J. was returned ten days later. Two months later, on December 8, 2011, T.J. received emergency medical care for injuries he received while being supervised by Debbie. Those injuries included bite marks on his back from Debbie's grandson, multiple bruises on his buttocks in different stages of healing, and bruises to both sides of his face. Debbie's explanation of the injuries was that he fell into a fireplace while she was briefly outside. Due to these injuries, on December 9, 2011, the children were again removed from the home. Following this removal, Debbie again overdosed on her medication and was readmitted to the Pavilion on a suicide watch. Based upon these incidents, the Department's plan for the children changed from reunification to termination. Since the second removal, the children have remained in foster care.

### DEBBIE'S PLAN COMPLIANCE

Following implementation of the *Family Service Plan* in September 2010, Debbie participated in and completed court ordered and recommended services. She successfully completed the "Families in Crisis Program," the "Specialized Females Program," and the substance abuse program conducted by the Amarillo Council on

4

Alcoholism and Drug Abuse. According to her counselor she had zero "no shows" and she maintained a "good" overall attitude. She "took responsibility" for the situation, met behavioral expectations, and acknowledged her continued need for treatment and participation in a recovery program. She had an AA/NA sponsor and she attended a group session on "almost a daily basis." She eventually obtained gainful employment and at the time of the final hearing had been employed for over eleven months. At the final hearing, Debbie offered witnesses who confirmed her sobriety and her willingness to take steps to provide a safe environment for her children.

Debbie's compliance was not, however, without incident. While the children were in foster care she was convicted of the two criminal offenses previously mentioned. Furthermore, after the children were returned to her in October 2011, Debbie was told that her older son, C.J. could have no access to the children. Despite acknowledging this requirement, Debbie continued to allow C.J. into her home on occasion. She also continued to make poor choices concerning her male companions and, as previously mentioned, she suffered from psychological issues, including two suicide attempts.

**THE CHILDREN**

After K.J. and T.J. were removed from the home for the second time, they were placed together in a foster home. At trial, the Department caseworker testified the children were comfortable, happy, healthy, doing well, and interacting favorably with their foster parents. The caseworker further described the children as thriving with all their physical, psychological, and medical needs being met. T.J. was participating in speech therapy, occupational therapy and physical therapy for delayed development.

Due to their ages, neither child expressed an opinion as to their preferences, although it was reported that they do refer to their foster parents as "mom" and "dad." Additionally, the foster parents want to adopt when the termination becomes final.

### FINAL ORDERS

On May 17, 2012, a hearing was held and on July 6, 2012, the trial court issued its *Order of Termination* in each case. By the respective orders, the trial court found Debbie had knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotion well-being and she engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered their physical or emotional well-being. *See* §§ 161.001(1)(D), (E).[3] The trial court also determined that it was in the children's best interest that the parent-child relationship be terminated. § 161.001(2).

### THE ISSUE

Debbie concedes the evidence is legally sufficient to support the statutory grounds for termination the Department sought to establish under subsections (D) and (E) of section 161.001(1). Where Debbie disagrees with the order of termination is the trial court's best interest determination. She contends there were options less drastic than termination that would have protected her rights as a parent, while at the same time met the needs of the children. Specifically, she contends the trial court should

---

[3]Throughout the remainder of this opinion, provisions of the Texas Family Code will be cited as "section ___" and "§ ___," section 161.001(1)(D) will be referred to as "subsection (D)," and section 161.001(1)(E) will be referred to as "subsection (E)."

have continued the children's placement with their foster parents, while naming her as a possessory conservator.

## DISCUSSION

### INVOLUNTARY TERMINATION – STANDARD OF REVIEW

The natural right existing between parents and their children is a right "far more precious than any property right" and is, therefore, one of constitutional dimension. *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *accord In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Consequently, termination proceedings are strictly scrutinized. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985). Parental rights, however, are not absolute and it is essential that the emotional and physical interests of a child not be sacrificed merely to preserve those rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In proceedings to terminate the parent-child relationship brought under section 161.001, the petitioner must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and, also prove that termination is in the best interest of the child. § 161.001; *In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005). Though the same evidence may be probative of both issues, both elements must be established and proof of one element does not relieve the petitioner of the burden of proving the other. *See In re C.H.,* 89 S.W.3d at 28; *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Furthermore, due to the elevated status of parental rights, due process requires that the quantum of proof necessary in a parental-termination proceeding be elevated from preponderance of the evidence to clear and convincing evidence. *See In re E.N.C.,* No.

7

11-0713, 2012 Tex. LEXIS 866, at *13, 56 Tex. Sup. J. 19 (Tex. Oct. 12, 2012) (citing *In re J.F.C.,* 96 S.W.3d 256, 253 (Tex. 2002)). *See also* § 161.001.

Clear and convincing evidence is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." § 101.007 (WEST 2008); *In re E.N.C.,* 2012 Tex. LEXIS 866, at *13-14. Involuntary termination proceedings are strictly construed in favor of the parent. *Id.* at *14.

In a legal sufficiency review of the evidence to support an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a trier of fact could have reasonably formed a firm belief or conviction as to the truth of the allegations sought to be established. § 101.007; *In re J.F.C.*, 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions and the role of an appellate court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id.* A corollary to this rule is that we also disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* This does not, however, mean that we disregard all evidence that does not support the finding, *id.*, or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex.App.—Amarillo 1995, no writ).

If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the

matter that must be proven is true, then the court must conclude the evidence is legally insufficient. Where the evidence is legally insufficient, rendition of judgment in favor of the parent is generally required. *Id. See also In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009).

When we conduct a factual sufficiency review of the evidence under a clear and convincing burden of proof, the analysis is somewhat different in that we must consider all the evidence equally, both disputed and undisputed, giving due consideration to any evidence the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.*., 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

### SECTION 161.001(1)(D), (E)

The trial court found that Debbie knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being and also engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical and emotional well-being. *See* §§ 161.001(1)(D), (E). "Endanger" means to expose to loss or injury--to jeopardize. *See In re J.T.G.,* 121 S.W.3d 117, 125 (Tex.App.—Fort Worth 2003, no pet.). Although "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment"; *Walker v. Tex. Dep't of Family and Protective Servs.*, 312 S.W.3d 608, 616 (Tex.App.—Houston [1ˢᵗ Dist.]

9

2009, pet. denied), danger to a child need not be established as an independent proposition but may be inferred from parental misconduct even if the conduct is not directed at the child and the child suffers no actual injury. *See Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987). Moreover, the conduct does not have to occur in the child's presence; *Director of Dallas Cty. Child Protective Servs. v. Bowling*, 833 S.W.2d 730, 733 (Tex.App.—Dallas 1992, no writ), and may occur before the child's birth and both before and after the child has been removed by the Department. *See In re S.M.L.D.,* 150 S.W.3d 754, 757-58 (Tex.App.—Amarillo 2004, no pet.); *In re D.M.,* 58 S.W.3d 801, 812 (Tex.App.—Fort Worth 2001, no pet.).

Under subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was a source of endangerment to the child's physical or emotional well-being. *In re D.T.,* 34 S.W.3d 625, 632 (Tex.App.—Fort Worth 2000, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *See In re S.M.L.,* 171 S.W.3d 472, 477 (Tex.App.—Houston [14th Dist.] 2005, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *See In re J.T.G.,* 121 S.W.3d at 125 (abuse or violent conduct by a parent or other resident of home may produce an endangering environment). *See also In re W.S.*, 899 S.W.2d 772, 776 (Tex.App.—Fort Worth 1995, no writ) ("environment" refers not only to the acceptability of living conditions, but also to a parent's conduct in the home). Subsection (D) permits termination based upon a single act or omission. *Id.*

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *In re J.T.G.,* 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by a parent is required. *Id.; In re D.T.*, 34 S.W.3d at 634. Thus, while both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment. *In re S.M.L.*, 171 S.W.3d at 477. Subsection (D) concerns the child's living environment, rather than the conduct of the parent, though parental conduct is certainly relevant to the child's environment, and subsection (E) requires a course of conduct rather than a single act or omission. *Id.* (citing *In re J.T.G.*, 121 S.W.3d at 125). *See In re R.D.,* 955 S.W.2d 364, 367 (Tex.App.—San Antonio 1997, pet. denied).

To determine whether termination is necessary, the factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.—Fort Worth 2009, no pet.). Conduct that subjects a child to a life of uncertainty and instability also endangers the child's physical and emotional well-being. *Id.; In re S.D.,* 980 S.W.2d 758, 763 (Tex.App.—San Antonio 1998, pet. denied).

Based upon a review of the record, we agree with Debbie that a reasonable factfinder could have formed a firm belief or conviction as to the truth of the statutory grounds for termination the Department sought to establish under subsections (D) and (E) of section 161.001(1). Accordingly, we proceed to the trial court's best interest finding.

**BEST INTEREST OF THE CHILD**

In addition to a predicate violation, the Department must also establish by clear and convincing evidence that termination is in the best interest of the child. § 161.001(2). Therefore, notwithstanding the sufficiency of the evidence to support termination under subsections (D) and (E), we must also find clear and convincing evidence that termination of the parent-child relationship was in the best interest of K.J. and T.J. The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may also be probative in determining best interest under section 161.001(2). *In re C.H.*, 89 S.W.3d at 28.

While there is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship*; see In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006) (*per curiam*), we must not lose sight of the fact that the best interest of the child is always the primary consideration of the trial court in determining issues of conservatorship, possession, and access to a child. § 153.002. In determining best interest, the focus is on the best interest of the child--not the parent. *See Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 86 (Tex.App.—Dallas 1995, no writ). An appellate court's review of the factfinder's conclusions must not be so rigorous that the emotional and physical interests of the child are sacrificed, *In re C.H.*, 89 S.W.3d at 26, and the prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. § 263.307(a) (WEST 2008). In making a best interest determination, a factfinder may consider the fact that termination of parental rights may allow an adoption to occur so that an impermanent

foster care arrangement can be replaced by the permanent relationship that an adoption affords. *See In re C.H.*, 89 S.W.3d at 27.

In *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact in a termination case may use in determining the best interest of the child. *Id.* at 371-72. These factors include: (1) the desires of the child; (2) the emotional and physical needs of the child *now and in the future*; (3) the emotional and physical danger to the child *now and in the future*; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the *plans for the child* by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and some of the listed factors may be inapplicable to some cases, while other factors not listed may also be considered when appropriate. *In re C.H.*, 89 S.W.3d at 27. Furthermore, there is no requirement that the Department prove all factors as a condition precedent to a finding that termination is in the best interest of the child, as undisputed evidence of just one factor can be sufficient in a given case. *Id.*

### ANALYSIS

With these considerations in mind, we review the evidence. Debbie asserts the evidence pertaining to the best interest of the children was legally and factually insufficient because the trial court did not consider the less drastic option of continuing

13

placement of the children with their foster parents while appointing her as a possessory conservator. She contends the trial court's decision was error because she had complied with the directives of the Department, she was drug-free, she made other positive improvements in her personal life, and her supervised visitation with the children while in foster care had been satisfactory. While we do not disagree with her contention that there were less drastic options available to the trial court, given the evidence, it is not unreasonable for us to conclude the trial court believed that, if left in Debbie's care, the children would continue to live in a highly unstable and uncertain environment. Nor is it unreasonable for us to conclude the trial court believed the children were then living in a positive, safe and secure foster home with the very real prospect of adoption. The children were doing well and were comfortable. The children's caseworker described them as "thriving" in their new home with all their needs being met. While the fact that Debbie has taken significant and positive steps towards providing a safe, stable and permanent environment for her children is to be commended, we cannot evaluate the factfinder's decision in the vacuum of the circumstances as they existed at the time of the final hearing and we must give appropriate deference to the factfinder's judgment regarding the future best interest of the children. Considering the entire record, we cannot say that a reasonable factfinder could not have formed a firm belief or conviction that termination of Debbie's parental rights was in the best interest of the children. Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's best interest finding.

## Conclusion

Debbie's single issue is overruled and the trial court's order of termination is affirmed.

Patrick A. Pirtle
Justice

Quinn, C.J., concurring in result.